1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    FREDERICK E. LEONARD,                    No.  2:19-cv-1982-KJM-EFB P

12                 Petitioner,

13          v.                                 FINDINGS AND RECOMMENDATIONS

14    ROBERT NEUSCHMID,

15                 Respondent.

16

17          Petitioner is a California state prisoner who, proceeding without counsel, brings an

18    application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  In 2016 and in the Solano

19    County Superior Court, petitioner was convicted of: (1) mayhem (Penal Code § 203) and (2)

20    injury to the mother of petitioner's child (§ 273.5).  The jury found true the enhancement of great

21    bodily injury (§ 12022.7, subd.(e)) in connection with the latter count.

22          Petitioner now argues that his rights were violated during his trial.  Specifically, he

23    contends that: (1) the trial court violated his due process rights by admitting a silent video of him

24    attacking another inmate shortly before trial; (2) the prosecutor committed misconduct while

25    questioning petitioner by referring to a motion to increase his bail and a letter petitioner wrote the

26    victim which mentioned a 17-year offer; and (3) his due process rights were violated by the trial

27    court's decision to have him shackled in the jury's presence.

28          For the reasons stated hereafter, the petition should be denied.

                                                   1

## FACTUAL BACKGROUND

The court has reviewed the state appellate court's summation of the facts. Having determined that it is consistent with the record, it is reproduced here:

**A. The Prosecution's Case**

In July 2014, defendant lived in Vallejo with S.S. (victim), their one child, and the victim's two additional children. Defendant and the victim had been in a romantic relationship for nearly 11 years but had recently decided to split up. Defendant was still living in a separate room in their home and paying some rent while co-parenting with the victim. However, by mutual agreement they were no longer in a romantic relationship, and he was saving money and making arrangements to move elsewhere in the near future.

On or about July 15, 2014, defendant entered the victim's upstairs bedroom where she was nearly asleep and asked her to come downstairs. Defendant had been drinking, smoking marijuana and watching television for several hours with a friend. The victim had retired to her bedroom soon after returning from work earlier in the evening. Quite tired, the victim initially protested his request; however, eventually, she made her way downstairs. The victim lay down on a futon in defendant's room and "zoned out" as defendant began "ranting." Suddenly, defendant ran across the room and struck the victim in the face with his fist.[1] He continued to yell and hit her in the face and chest, as the victim began bleeding significantly from her face. The victim told defendant her nose could be broken and she needed to go to the hospital, but defendant refused to take her, stating that he had no intention to go to jail and would kill her first.

Warning the victim not to bleed on his bed, defendant instructed her to take off her clothes, and he put them with the bed linens in the washing machine. He then began cleaning blood from the floor and walls and then went with the victim upstairs so the victim could shower. Eventually, they both returned downstairs. The victim grabbed defendant's phone and ran upstairs and locked the door. Still bleeding, the victim then put on a robe, called the police "a couple of times," called her mother (**Silva**), gathered her children and left the house.

Silva testified that the victim called her at about 2:00 a.m. In a shaky and scared voice, she told Silva to "come over, please. I need you." Silva arrived, finding her daughter covered in blood. She told the victim she needed to go to the hospital. Silva took the children back

---

[1] **[footnote two in original text]** According to defendant, the victim had been drinking and came downstairs to "start something" with him. Defendant stated the victim had become angry after hearing from a neighbor that he and his friend had brought women into their house. She told him to immediately leave the house, but he refused, reminding her that he paid rent to live there.

to her house, then returned with her son to drive the victim to the hospital. Silva also called the police to advise them she would be taking the victim to the hospital.

By the time they arrived at the hospital, the victim's face was swollen and she could barely see. She was given pain medication and, shortly thereafter, the police arrived. The victim was then transferred to another hospital, where she underwent surgery to address fractures to her orbital rim. The victim's physician determined she had a hole in her eyeball socket and was concerned that her eyeball would sink, causing double vision. The medial aspect of the victim's orbital rim was also completely shattered, requiring plates, screws and mesh to repair. There was additional damage to her nose and bruises on her arms and chest. After four or five days, the victim was released from the hospital; however, as of trial, she still had double vision and no feeling in part of her face.

A friend helped the victim submit an online police report detailing the incident. This was not, however, the first time the police had been contacted regarding domestic violence by defendant against the victim. Over a defense objection, the victim and Silva testified about another incident that occurred in 2004, when the newly formed couple had been out drinking. At first, the couple were playing around. However, defendant suddenly became angry and began choking her and poking her arms very hard. The victim, nearly losing consciousness, ended up with a bruised and bleeding face, a black eye, and bruised arms.

Initially, the victim did not report the 2004 incident to the police. About a week later, however, she visited Silva, still visibly injured. When Silva asked what happened, the victim first lied and said someone other than defendant had hurt her but eventually acknowledged defendant was her attacker. Silva called the police, and two officers made contact with defendant to question him about the incident. Defendant denied being the victim's boyfriend or causing her injuries. Afterward, the couple resumed their relationship.

**B. The Defense Case**

At trial, defendant denied the victim's account of what occurred on or about July 15, 2014. On the contrary, he insisted that the victim had attacked him during a heated argument, taking his phone and then repeatedly shooting him with her stun gun.[2] Earlier that day, the victim had shown defendant her new stun gun, and when he asked why she had bought it, the victim replied, "Well, it could be for you."

_____

[2] [**footnote three in original text**] The victim acknowledged at trial that she had a stun gun that she had bought at a garage sale to protect herself when making late night trips to the store. At the time, she testified, defendant jokingly asked whether she intended to use it on him. However, on the night of July 15, 2014, the victim did not have the stun gun and did not know where in the house it was located.

After defendant tried to grab his phone back from the victim, she stunned him on the arm, leaving a mark. He then grabbed her arm and hit her on the side of her face to thwart her attack, but she stunned him several more times. At one point during her attack, the electric jolt from her stun gun was strong enough to cause him to urinate on himself. According to defendant, each time the victim stunned him with the gun, he would hit her, but not "to knock her out. I was just basically trying to stop her." After his fourth hit did not stop the victim's attack, defendant "hip-slammed" her to the ground. The stun gun fell out of her hand, and she tried to bite him as she struggled to get away. Defendant, however, held the victim down by the shoulders as he tried to steady himself, still feeling the electricity passing through his body. He sat on the victim until eventually the electricity left his body and the pain subsided, as she kept screaming.

Afterward, the victim tried to make defendant take her to the hospital, but he refused, telling her, "Look. Well, if you call the police, I'm standing right here, and I ain't going nowhere. Call them." Defendant did not leave the house. He eventually dozed off and vaguely recalled hearing the victim and the children leave.

On July 19, 2014, the police came to question him about the incident. Defendant denied laying a hand on the victim.

Afterward, the victim went to stay at Silva's house, although she would cross paths with defendant occasionally when she came to the house to shower or retrieve her belongings. They got along fine, but the victim warned defendant to be careful, as Silva had told the neighbors what had happened. Defendant moved out of the house about two months later, after the victim told him to leave and that she was getting a restraining order because Silva did not want him living in the house. They remained in contact, however, because they were "missing each other."

Defendant tried to tell Silva the truth about what had happened (that the victim had attacked him), but Silva called him crazy and insisted he should be locked up in an institution.

Defendant denied that the victim lost a significant amount of blood or suffered serious injuries from his efforts at self-defense on the night in question. Defendant noticed the victim had a "knot" on her eye and some blood coming from her nose, but "nothing profuse . . . ." He insisted that he never disclosed the truth of what happened to the police—even when the police came to question defendant about the victim's report—because he did not trust the investigating officer, whom he recognized as the same officer who had arrested him in 2004 based on the victim's "false" report of domestic violence. According to defendant, this officer held a personal grudge against him and could not be trusted.

When defendant was cross-examined about letters and text messages he wrote to the victim after the incident, defendant insisted the victim was regularly calling him and felt bad about his arrest and incarceration. She asked how she could help. Defendant responded by telling her she could help him by contacting his attorney.

4

According to defendant, the victim continued to see him even after getting the restraining order. When asked about a particular letter in which he described himself to the victim as remorseful and as a "sick man," defendant explained he was on medication at the time and was remorseful about not seeing his children.

With respect to the 2004 domestic violence report, defendant insisted the victim's police report was "false" and that he had been dating another woman at the time. He claimed this other woman had told him the victim had started a fight with her and that, when he saw the victim a few days later, she looked as if she had been in a fight because she had scratches and marks on her face and arms. Defendant insisted that he never truly got over the victim's false allegations against him and that, although they were in an on-and-off relationship for over 10 years and had a child together, "I wasn't in love with her."

**C. The Prosecution's Rebuttal Witness**

Deputy Sheriff Jason Brackett testified on rebuttal for the prosecution that on July 12, 2016, defendant had been involved in a jailhouse altercation with another inmate. The jury was then shown a silent video of the incident, the People's exhibit 12-B, that Brackett had reviewed afterward. In this video, defendant can be seen punching the other inmate, cutting him above his eye and on his upper lip.

When questioned about this incident, defendant explained that the inmate had been yelling racial slurs and threatening to kill people, including defendant. Based on the inmate's aggressive behavior, defendant decided to punch him to protect himself. Defendant described striking the inmate multiple times. According to defendant, the inmate never fought back because defendant "was the better man." Afterward, the inmate returned to his cell while defendant cleaned up the blood on the floor because he was concerned everyone in the unit would get in trouble if there was a mess.

On October 28, 2016, the jury found defendant guilty of counts 1 and 2, and found true the allegation that, with respect to count 2, he inflicted great bodily injury. The jury acquitted defendant on the remaining counts. On June 30, 2017, the trial court sentenced defendant to a total term of seven years in prison.

ECF No. 14-8 at 4-8.

STANDARDS GOVERNING HABEAS RELIEF UNDER THE AEDPA

I.    Applicable Statutory Provisions

28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), provides in relevant part as follows:

/////

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Section 2254(d) constitutes a "constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus." *(Terry) Williams v. Taylor*, 529 U.S. 362, 412 (2000). It does not, however, "imply abandonment or abdication of judicial review," or "by definition preclude relief." *Miller El v. Cockrell*, 537 U.S. 322, 340 (2003). If either prong (d)(1) or (d)(2) is satisfied, the federal court may grant relief based on a de novo finding of constitutional error. *See Frantz v. Hazey*, 533 F.3d 724, 736 (9th Cir. 2008) (en banc).

The statute applies whenever the state court has denied a federal claim on its merits, whether or not the state court explained its reasons. *Harrington v. Richter*, 562 U.S. 86, 99-100 (2011). State court rejection of a federal claim will be presumed to have been on the merits absent any indication or state law procedural principles to the contrary. *Id.* at 784-785 (citing *Harris v. Reed*, 489 U.S. 255, 265 (1989) (presumption of a merits determination when it is unclear whether a decision appearing to rest on federal grounds was decided on another basis)). "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." *Id.* at 785.

A.    "Clearly Established Federal Law"

The phrase "clearly established Federal law" in § 2254(d)(1) refers to the "governing legal principle or principles" previously articulated by the Supreme Court. *Lockyer v. Andrade*, 538 U.S. 63, 71 72 (2003). Only Supreme Court precedent may constitute "clearly established Federal law," but courts may look to circuit law "to ascertain whether . . . the particular point in

/////

6

issue is clearly established by Supreme Court precedent." *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013).

                B.      "Contrary To" Or "Unreasonable Application Of" Clearly Established Federal Law

Section 2254(d)(1) applies to state court adjudications based on purely legal rulings and mixed questions of law and fact. *Davis v. Woodford*, 384 F.3d 628, 637 (9th Cir. 2003). The two clauses of § 2254(d)(1) create two distinct exceptions to AEDPA's limitation on relief. *Williams*, 529 U.S. at 404-05 (the "contrary to" and "unreasonable application" clauses of (d)(1) must be given independent effect, and create two categories of cases in which habeas relief remains available).

A state court decision is "contrary to" clearly established federal law if the decision "contradicts the governing law set forth in [the Supreme Court's] cases." *Id.* at 405. This includes use of the wrong legal rule or analytical framework. "The addition, deletion, or alteration of a factor in a test established by the Supreme Court also constitutes a failure to apply controlling Supreme Court law under the 'contrary to' clause of the AEDPA." *Benn v. Lambert*, 283 F.3d 1040, 1051 n.5 (9th Cir. 2002). *See, e.g., Williams*, 529 U.S. at 391, 393 95 (Virginia Supreme Court's ineffective assistance of counsel analysis "contrary to" *Strickland*[3] because it added a third prong unauthorized by *Strickland*); *Crittenden v. Ayers*, 624 F.3d 943, 954 (9th Cir. 2010) (California Supreme Court's *Batson*[4] analysis "contrary to" federal law because it set a higher bar for a prima facie case of discrimination than established in *Batson* itself); *Frantz*, 533 F.3d at 734 35 (Arizona court's application of harmless error rule to *Faretta*[5] violation was contrary to U.S. Supreme Court holding that such error is structural). A state court also acts contrary to clearly established federal law when it reaches a different result from a Supreme Court

*/////*

---

    [3] *Strickland v. Washington*, 466 U.S. 668 (1984).

    [4] *Batson v. Kentucky*, 476 U.S. 79 (1986).

    [5] *Faretta v. California*, 422 U.S. 806 (1975).

7

case despite materially indistinguishable facts. *Williams*, 529 U.S. at 406, 412 13; *Ramdass v. Angelone*, 530 U.S. 156, 165-66 (2000) (plurality op'n).

A state court decision "unreasonably applies" federal law "if the state court identifies the correct rule from [the Supreme Court's] cases but unreasonably applies it to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 407 08. It is not enough that the state court was incorrect in the view of the federal habeas court; the state court decision must be objectively unreasonable. *Wiggins v. Smith*, 539 U.S. 510, 520 21 (2003). This does not mean, however, that the § (d)(1) exception is limited to applications of federal law that "reasonable jurists would all agree is unreasonable." *Williams*, 529 U.S. at 409 (rejecting Fourth Circuit's overly restrictive interpretation of "unreasonable application" clause). State court decisions can be objectively unreasonable when they interpret Supreme Court precedent too restrictively, when they fail to give appropriate consideration and weight to the full body of available evidence, and when they proceed on the basis of factual error. *See, e.g., Williams*, 529 U.S. at 397-98; *Wiggins*, 539 U.S. at 526 28 & 534; *Rompilla v. Beard*, 545 U.S. 374, 388 909 (2005); *Porter v. McCollum*, 558 U.S. 30, 42 (2009).

The "unreasonable application" clause permits habeas relief based on the application of a governing principle to a set of facts different from those of the case in which the principle was announced. *Lockyer*, 538 U.S. at 76. AEDPA does not require a nearly identical fact pattern before a legal rule must be applied. *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007). Even a general standard may be applied in an unreasonable manner. *Id.* In such cases, AEDPA deference does not apply to the federal court's adjudication of the claim. *Id.* at 948.

Review under § 2254(d) is limited to the record that was before the state court. *Cullen v. Pinholster*, 563 U.S. 170, 180-81 (2011). The question at this stage is whether the state court reasonably applied clearly established federal law to the facts before it. *Id.* In other words, the focus of the § 2254(d) inquiry is "on what a state court knew and did." *Id.* at 1399.

Where the state court's adjudication is set forth in a reasoned opinion, § 2254(d)(1) review is confined to "the state court's actual reasoning" and "actual analysis." *Frantz*, 533 F.3d at 738 (emphasis in original). A different rule applies where the state court rejects claims summarily,

without a reasoned opinion.  In *Harrington*, *supra*, the Supreme Court held that when a state court denies a claim on the merits but without a reasoned opinion, the federal habeas court must determine what arguments or theories may have supported the state court's decision, and subject those arguments or theories to § 2254(d) scrutiny.  *Harrington*, 562 U.S. at 101-102.

### C.       "Unreasonable Determination of The Facts"

Relief is also available under AEDPA where the state court predicated its adjudication of a claim on an unreasonable factual determination.  Section 2254(d)(2).  The statute explicitly limits this inquiry to the evidence that was before the state court.

Even factual determinations that are generally accorded heightened deference, such as credibility findings, are subject to scrutiny for objective reasonableness under § 2254(d)(2).  For example, in *Miller El v. Dretke*, 545 U.S. 231 (2005), the Supreme Court ordered habeas relief where the Texas court had based its denial of a *Batson* claim on a factual finding that the prosecutor's asserted race neutral reasons for striking African American jurors were true.  *Miller El*, 545 U.S. at 240.

An unreasonable determination of facts exists where, among other circumstances, the state court made its findings according to a flawed process – for example, under an incorrect legal standard, or where necessary findings were not made at all, or where the state court failed to consider and weigh relevant evidence that was properly presented to it.  *See Taylor v. Maddox*, 366 F.3d 992, 999 1001 (9th Cir.), cert. denied, 543 U.S. 1038 (2004).  Moreover, if "a state court makes evidentiary findings without holding a hearing and giving petitioner an opportunity to present evidence, such findings clearly result in a 'unreasonable determination' of the facts" within the meaning of § 2254(d)(2).  *Id.* at 1001; *accord Nunes v. Mueller*, 350 F.3d 1045, 1055 (9th Cir. 2003) (state court's factual findings must be deemed unreasonable under section 2254(d)(2) because "state court . . . refused Nunes an evidentiary hearing" and findings consequently "were made without . . . a hearing"), *cert. denied*, 543 U.S. 1038 (2004); *Killian v. Poole*, 282 F.3d 1204, 1208 (9th Cir. 2002) ("state courts could not have made a proper determination" of facts because state courts "refused Killian an evidentiary hearing on the matter"), *cert. denied*, 537 U.S. 1179 (2003).

A state court factual conclusion can also be substantively unreasonable where it is not fairly supported by the evidence presented in the state proceeding. *See, e.g., Wiggins*, 539 U.S. at 528 (state court's "clear factual error" regarding contents of social service records constitutes unreasonable determination of fact); *Green v. LaMarque*, 532 F.3d 1028 (9th Cir. 2008) (state court's finding that the prosecutor's strike was not racially motivated was unreasonable in light of the record before that court); *Bradley v. Duncan*, 315 F.3d 1091, 1096 98 (9th Cir. 2002) (state court unreasonably found that evidence of police entrapment was insufficient to require an entrapment instruction), *cert. denied*, 540 U.S. 963 (2003).

## II. The Relationship Of § 2254(d) To Final Merits Adjudication

To prevail in federal habeas proceedings, a petitioner must establish the applicability of one of the § 2254(d) exceptions and also must also affirmatively establish the constitutional invalidity of his custody under pre AEDPA standards. *Frantz v. Hazey*, 533 F.3d 724 (9th Cir. 2008) (en banc). There is no single prescribed order in which these two inquiries must be conducted. *Id.* at 736, 37. The AEDPA does not require the federal habeas court to adopt any one methodology. *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003).

In many cases, § 2254(d) analysis and direct merits evaluation will substantially overlap. Accordingly, "[a] holding on habeas review that a state court error meets the § 2254(d) standard will often simultaneously constitute a holding that the [substantive standard for habeas relief] is satisfied as well, so no second inquiry will be necessary." *Frantz*, 533 F.3d at 736. In such cases, relief may be granted without further proceedings. *See, e.g., Goldyn v. Hayes*, 444 F.3d 1062, 1070 71 (9th Cir. 2006) (finding § 2254(d)(1) unreasonableness in the state court's conclusion that the state had proved all elements of the crime, and granting petition); *Lewis v. Lewis*, 321 F.3d 824, 835 (9th Cir. 2003) (finding § 2254(d)(1) unreasonableness in the state court's failure to conduct a constitutionally sufficient inquiry into a defendant's jury selection challenge, and granting petition); *Williams v. Ryan*, 623 F.3d 1258 (9th Cir. 2010) (finding § 2254(d)(1) unreasonableness in the state court's refusal to consider drug addiction as a mitigating factor at capital sentencing, and granting penalty phase relief).

/////

In other cases, a petitioner's entitlement to relief will turn on legal or factual questions beyond the scope of the § 2254(d) analysis. In such cases, the substantive claim(s) must be separately evaluated under a de novo standard. *Frantz*, 533 F.3d at 737. If the facts are in dispute or the existence of constitutional error depends on facts outside the existing record, an evidentiary hearing may be necessary. *Id.* at 745; *see also Earp*, 431 F.3d 1158 (remanding for evidentiary hearing after finding § 2254(d) satisfied).

## DISCUSSION

I.  Admission into Evidence of Prior Acts of Violence

Petitioner, as noted *supra*, argues that the trial court's decision to admit a silent video of him attacking another jail inmate violated his due process rights.

A.  State Court Decision

The state court of appeal rejected this claim on direct review:

> Defendant first challenges the trial court's admission of two separate incidents of violence that occurred independently of the charged offenses—a prior act of domestic violence toward the victim in 2004[6] and a postcharges act of jailhouse violence toward another inmate in 2016.
>
> Evidence of a defendant's character or reputation for violence is generally not admissible to prove the conduct of the defendant on a particular occasion; however, this rule does not bar admission of evidence of uncharged misconduct when this evidence is relevant to establish some fact other than the defendant's character or disposition to commit crime. (Evid. Code, § 1101, subds. (a), (b); People v. Ewoldt (1994) 7 Cal.4th 380, 393, 27 Cal. Rptr. 2d 646, 867 P.2d 757.) Relevant here, a defendant's other act(s) of violence, charged or uncharged, may be admissible to prove a common plan or scheme under Evidence Code section 1101, subdivision (b), and where, as here, the act involves domestic violence, may be admissible under Evidence Code section 1109. In addition, "[n]othing in [Evidence Code section 1101] affects the admissibility of evidence offered to support or attack the credibility of a witness." (Evid. Code, § 1101, subd. (c).) However, even evidence falling within these statutory exceptions is inadmissible under Evidence Code section 352 where the trial court determines "the probative value of the evidence is substantially outweighed by the probability the evidence will consume an undue amount of time or create a substantial danger of

---

[6] The immediate petition, insofar as the court can tell, does not challenge the admission of the 2004 domestic violence incident. It takes issue only with the trial court's decision to admit evidence concerning the 2016 jailhouse violence incident. Thus, the appellate court's discussion of the 2004 incident will be omitted.

11

undue prejudice, confusion of issues, or misleading the jury." (People v. Brown (2011) 192 Cal.App.4th 1222, 1233, 121 Cal. Rptr. 3d 828; accord, Evid. Code, § 1109, subd. (a)(1).)

On appeal, we review an evidentiary ruling for an abuse of discretion, reversing only if the challenged ruling is shown to be arbitrary, capricious or patently absurd, resulting in a manifest miscarriage of justice. (*People v. Brown*, *supra*, 192 Cal.App.4th at p. 1233.) With these legal principles in mind, we turn to defendant's specific challenges.

. . .

Defendant also challenges the trial court's admission of evidence relating to a more recent uncharged act of violence—a jailhouse altercation he was involved in shortly before trial while incarcerated in July 2016. A silent video was shown to the jury where an inmate named Butler was walking alone down a long hallway in the cell block. Butler appears to be ranting at no one in particular; defendant is not visible. When Butler has walked about two-thirds of the hallway, defendant can be seen abruptly leaving his cell and following behind Butler. When defendant nearly reaches Butler, Butler turns around just in time to have defendant punch him repeatedly in the face before defendant returns to his cell. Butler first holds his face, appearing stunned, then eventually starts to clean up the blood with a cloth before returning to his cell. Defendant then appears to finish the cleaning.

The prosecution offered the evidence to impeach defendant's claim to have acted in self-defense after the victim attacked him with a stun gun. According to the prosecutor, the jailhouse incident showed defendant acted according to "a common plan and scheme, that the defendant, when he's angered, conducts himself in this manner." The trial court accepted the prosecutor's arguments, admitting the evidence as relevant to rebut defendant's claim of self-defense and to demonstrate he acted based on a common scheme or plan (Evid. Code, §§ 1101, subd. (b), 1105), and finding that its prejudicial impact did not outweigh its probative value (Evid. Code, § 352).

Defendant challenges the admission of this evidence on the grounds the jailhouse incident was not sufficiently similar to the charged offense to be probative of any common plan or scheme and that its admission resulted in undue prejudice and confusion. In making this challenge, defendant notes, first, that the uncharged incident involved a jail altercation with another inmate. On the other hand, the trial incident was an emotionally charged domestic violence situation occurring two years earlier. Second, defendant notes that the jail incident involved the inmate, Butler, cleaning up the resulting blood while it was defendant who allegedly cleaned up the blood in the trial incident. Third, defendant points out the silent video depicting the jailhouse altercation lacks any context leading up to his attack on Butler, whereas this incident, according to the victim, was preceded by a lengthy verbal argument with defendant.

We disagree these incidents are not sufficiently similar to warrant admission of this evidence. "The conduct admitted under Evidence Code section 1101(b) need not have been prosecuted as a crime, nor is a conviction required. [Citations.] The conduct may also have occurred after the charged events, so long as the other requirements for admissibility are met. [Citation.] Specifically, the uncharged act must be relevant to prove a fact at issue (Evid. Code, § 210), and its admission must not be unduly prejudicial, confusing, or time consuming (Evid. Code, § 352)." (*People v. Leon*, *supra*, 61 Cal.4th at pp. 597-598.) "[E]vidence that the defendant has committed uncharged criminal acts that are similar to the charged offense may be relevant if these acts demonstrate circumstantially that the defendant committed the charged offense pursuant to the same design or plan he or she used in committing the uncharged acts. Unlike evidence of uncharged acts used to prove identity, the plan need not be unusual or distinctive; it need only exist to support the inference that the defendant employed that plan in committing the charged offense." (*People v. Ewoldt*, *supra*, 7 Cal.4th at p. 403.)

Evidence of the jailhouse incident meets this standard. While there are differences between the two incidents, both involved defendant brutally lashing out at an unexpecting victim. While Butler was attacked by defendant from behind, the victim described herself as "zoned out" while seated on a futon, when attacked by defendant from across the room. Both victims sustained bloody injuries to the face (especially the eye region). No further showing was required to meet the "sufficiently similar" standard for a common plan or scheme (Evid. Code, § 1101, subd. (b)) or a habit (Evid. Code, § 1105), particularly in light of the need of the prosecution to rebut defendant's theory that he was acting in self-defense when inflicting the injuries on the victim in this case. (E.g., People v. Soper (2009) 45 Cal.4th 759, 778, 89 Cal. Rptr. 3d 188, 200 P.3d 816 ["a fact finder properly may consider [Evidence Code section 1101, subdivision (b)] evidence to prove intent, so long as (1) the evidence is sufficient to sustain a finding that the defendant committed both sets of crimes [citations], and further (2) . . . 'the factual similarities . . . tend to demonstrate that in each instance the perpetrator harbored' the requisite intent"].)

Moreover, defendant had ample opportunity when testifying to tell the jury his version of what happened during the jailhouse altercation. He explained that Butler had been yelling threats, obscenities and racial slurs, as well as urinating on the floor. According to defendant, Butler then approached him in a threatening manner, prompting defendant to punch him several times because he was concerned that if he did not take action to protect himself, Butler would harm him.

Nor did the trial court abuse its discretion in concluding the probative value of the jailhouse altercation was not outweighed by the substantial danger of undue prejudice. The video, reasonably construed, showed defendant, when angered, attacks the person who has angered him swiftly and brutally with his bare hands. In addition, it was relevant to show how defendant took steps to clean up his victim's blood upon completion of his attack. Juror confusion was

13

unlikely given the trial court's instruction that the uncharged offense could be considered only for the limited purpose of proving "whether or not: [¶] . . . defendant had a plan or scheme to commit the offenses alleged in this case[.] [¶] . . . [¶] Do not consider this evidence for any other purpose except for the limited purpose of determining the defendant's credibility. [¶] Do not conclude from this evidence that [he] has a bad character or is disposed to commit crime. . . ." Although this evidence may have been prejudicial to defendant, it was the ordinary sort of prejudice that arises from any evidence tending to show guilt. (*People v. Karis*, *supra*, 46 Cal.3d at p. 638.)

And in any event, even if we assume the trial court erred in admitting this evidence, any error was harmless given that it was not reasonably probable defendant would have achieved a more favorable result at trial had the video been excluded. (*People v. Malone* (1988) 47 Cal.3d 1, 22, 252 Cal. Rptr. 525, 762 P.2d 1249, citing *People v. Watson*, *supra*, 46 Cal.2d at p. 836 [harmless error standard].)[7]

Defendant's theory of self-defense contained many inconsistencies and implausibilities. Undisputed medical evidence established the victim suffered horrific injuries, including multiple fractures to her eye socket and damage to her nose that required surgery and has left her with facial numbness and double vision. She consistently testified these injuries resulted from defendant's unprovoked attack on the night in question. On the other hand, defendant insists he was the victim of her unprovoked attack with a stun gun. According to defendant, the victim repeatedly shot him with her stun gun, jolting him with enough electricity to make him urinate on himself. The victim denied knowing where the stun gun was that night. Despite the undisputed medical evidence of her injuries, defendant testified that, each time the victim stunned him with the gun, he would hit her, but not "to knock her out. I was just basically trying to stop her."

Defendant also denied the victim lost a significant amount of blood or suffered serious injuries. When asked why defendant did not tell the investigating officer that she, not he, was the attacker (he instead denied laying a hand on her), defendant claimed he was not comfortable giving the officer this information because he was the

---

[7] [**footnote six in original text**] We need not address defendant's argument that the trial court's admission of the jailhouse video violated his due process rights given that, one, the court's ruling was not erroneous and, two, assuming error solely for the sake of argument, the California Supreme Court has rejected this argument in the context of the sexual propensity statute, Evidence Code section 1108, for reasons equally applicable to other propensity statutes such as Evidence Code sections 1101, subdivision (b) and 1105. (*See People v. Falsetta* (1999) 21 Cal.4th 903, 921-922, 89 Cal. Rptr. 2d 847, 986 P.2d 182 [the possible exclusion of unduly prejudicial evidence pursuant to Evidence Code section 352 "saves" Evidence Code section 1108, the sexual propensity evidence statute, from attack on due process grounds].) We likewise rely on California Supreme Court precedent to reject defendant's argument that the elevated standard for establishing harmless error under *Chapman v. California* (1967) 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705, should apply. (*People v. Malone*, *supra*, 47 Cal.3d at p. 22 [rejecting the defendant's argument that error in admitting other-crimes evidence for the purpose for which it was admitted is a denial of due process and thus subject to a *Chapman* standard of review].)

same officer who had arrested him in 2004 based on the victim's "false" report of domestic violence and appeared to have a grudge against him. When asked why the victim later sought a restraining order against him, defendant claimed Silva, not the victim, wanted him out of the house. Lastly, when asked about letters and text messages he wrote to the victim after the incident, defendant insisted the victim was contacting him because she felt bad about what had happened and wanted to make amends.

Given the strength of the prosecution's case juxtaposed with the inherent weaknesses of the defense case, which was based largely on defendant's denials, we conclude defendant would not have achieved a more favorable result at trial even if the trial court had excluded the jailhouse incident video.

ECF No. 14-8 at 9-10, 14-18. Petitioner raised this claim in a petition for review to the California Supreme Court (*id.* at 32, 38) which was summarily denied (*id.* at 89).

### B.     Legal Standards

The Supreme Court has never held that using evidence of a defendant's past crimes, even to demonstrate a propensity for criminal activity, violates due process. *See Larson v. Palmateer,* 515 F.3d 1057, 1066 (9th Cir. 2008) (citing *Estelle v. McGuire,* 502 U.S. 62, 75 n.5 (1991)) ("The Supreme Court has expressly reserved the question of whether using evidence of the defendant's past crimes to show that he has a propensity for criminal activity could ever violate due process."); *see also Alberni v. McDaniel,* 458 F.3d 860, 863-64 (9th Cir. 2006) (rejecting argument that the introduction of propensity evidence violated due process and noting that "when the Supreme Court has expressly reserved consideration of an issue, as it has here, the petitioner cannot rely on circuit authority to demonstrate that the right he or she seeks to vindicate is clearly established."); *Holley v. Yarborough,* 568 F.3d 1091, 1101 (9th Cir.2009) ("[The Supreme Court] has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ."). Further, a federal habeas court does not review the propriety of state courts' interpretation of state law. *See Estelle*, 502 U.S. at 67-68.

### C.     Analysis

The absence of clearly established federal law dooms this claim. Under AEDPA, a habeas petition challenging a state court conviction will not be granted unless the decision "was contrary

to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). And, as noted *supra*, the Supreme Court has never held that the introduction of propensity evidence violates due process. Thus, the state court's decision must stand. *See Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (Because our cases give no clear answer to the question presented, let alone one in Van Patten's favor, it cannot be said that the state court unreasonabl[y] appli[ed] clearly established Federal law.") (internal quotation marks omitted).

## II. Prosecutorial Misconduct

Next, petitioner alleges that the prosecutor committed misconduct when she questioned him regarding: (1) a motion to increase bail; and (2) a letter he sent the victim in which he referred to a plea offer of seventeen years.

### A. State Court Decision

The foregoing allegations of prosecutorial misconduct were put before the state appellate court when petitioner challenged the trial court's denial of a mistrial. The state appellate court rejected petitioner's claim and reasoned:

> Defendant next challenges the trial court's denial of his motion for mistrial based on two incidents of purportedly improper questioning of him by the prosecutor. A mistrial should only be granted if the court is apprised of prejudice that it deems incurable by admonition or instruction, such that the moving party's chances of receiving a fair trial have been irreparably damaged. (*People v. Panah* (2005) 35 Cal.4th 395, 444, 25 Cal. Rptr. 3d 672, 107 P.3d 790; *People v. Haskett* (1982) 30 Cal.3d 841, 854, 180 Cal. Rptr. 640, 640 P.2d 776.) Whether erroneous admission of evidence cannot be cured and warrants a mistrial is generally left to the trial court's sound discretion. (*People v. Harris* (1994) 22 Cal.App.4th 1575, 1581, 28 Cal. Rptr. 2d 317.)
>
> Defendant's motion was based on the following two questions asked by the prosecutor during her cross-examination. The first question was, "Do you remember a date where they did a motion to increase bail, and you were remanded?" The second question asked defendant to confirm that a letter he sent to the victim after his arrest stated in part, "They're going to offer 17 years. I'm not turning my back. But I can't do that much time, paren, 17 years." According to defendant, these questions introduced improper subject matter to the jury that painted him "as a bad or potentially dangerous person" and appealed to the jury's "'passion and prejudice . . . .'"

The trial court denied defendant's motion, while admonishing the jury to disregard all questions and answers regarding "defendant sending correspondence that talked about 17 years" and "the motion to increase bail." The court also instructed the jury "not to consider penalty or punishment in making its decision as to whether or not the defendant is guilty or not guilty of the crimes that are before you." We address each alleged incident of prosecutorial misconduct below.

## A. Reference to Defendant's Increased Bail

With respect to the prosecutor's reference to the motion to increase bail, defendant refers us to the principle that "exposing a jury to a defendant's prior criminality presents the possibility of prejudicing a defendant's case and rendering suspect the outcome of the trial." (*People v. Harris*, *supra*, 22 Cal.App.4th at p. 1580.) Under California law, however, a prosecutor commits reversible misconduct only if "'he or she makes use of "deceptive or reprehensible methods" when attempting to persuade either the trial court or the jury, and it is reasonably probable that without such misconduct, an outcome more favorable to the defendant would have resulted. [Citation.] Under the federal Constitution, conduct by a prosecutor that does not result in the denial of the defendant's specific constitutional rights—such as a comment upon the defendant's invocation of the right to remain silent—but is otherwise worthy of condemnation, is not a constitutional violation unless the challenged action "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" [Citation.]' [Citation.]" (*People v. Fuiava* (2012) 53 Cal.4th 622, 679, 137 Cal. Rptr. 3d 147, 269 P.3d 568; *accord*, *People v. Harris* (1989) 47 Cal.3d 1047, 1083-1084, 255 Cal. Rptr. 352, 767 P.2d 619.) As a result, to assess the import of the prosecutor's words, we look at the record in context to determine if either of these standards for reversible misconduct exists.

The record reflects the allegedly improper reference to increased bail occurred during extensive questioning about the nature of defendant's relationship with the victim following the charged offenses. Earlier during trial, the victim had testified she did not attempt to contact him after he was arrested following this incident even though he made numerous efforts to contact her. Defendant, however, testified he and the victim were sometimes together at the house but that the victim cautioned him to "'be careful'" because Silva "'told the neighbors everything that happened.'" His testimony prompted the prosecutor to ask, "But didn't you say, 'So what? You attacked me, [victim]. You should be concerned for yourself'?" Defendant replied that he "told [Silva] plenty of times" that the victim had in fact attacked him but that Silva insisted "I needed to be in an insane asylum."

At this point, the prosecutor changed her focus to defendant's claim that Silva had been calling defendant (rather than him calling Silva) by asking whether defendant was in jail at the time and whether he had attempted to call Silva's house collect: "And, in fact, on July 17th you were calling [Silva] from the jail; isn't that true?" When defendant claimed again that Silva was calling him, the prosecutor

asked whether he called Silva's house twice on July 19th and nine times on July 20th in order to get in touch with the victim. Defendant testified he "[p]robably" called a couple of times but added, "Let's get one thing straight. [Silva] was also calling me, too." The prosecutor responded, "You were in the jail? [¶] . . . [¶] On July 20th you weren't in jail?" Then, in response to this question, defendant volunteered, "I bailed out of jail I think on the—on the 20th or the—yeah, the 20th or the 21st. Yeah, I bailed out."

The prosecutor then changed course again, asking whether on July 28th when out of custody defendant continued to call Silva's house "despite the restraining order," referencing a voicemail message on Silva's phone stating, "'You guys got the RO. Trying to set me up?'" Defendant denied the prosecutor's claim, insisting, "I don't even know what the RO is." To challenge defendant's denial, the prosecutor thus asked him whether he had at some point been returned to custody. Defendant responded, "Yeah. About eight months later. [¶] . . . [¶] I missed a court date." The prosecutor continued challenging the truth of his responses: "That's why you went back in custody?" Defendant answered, "Uh-huh," prompting the prosecutor to ask:, "Didn't you go back in custody because you were—went to [Silva's] house?— [¶] . . . [¶] And told her to have her daughter drop the charges?" Defendant denied the prosecutor's claim, at which point the prosecutor asked the allegedly improper question: "*Do you remember a date where they did a motion to increase bail, and you were remanded*?" (Italics added.)

Defense counsel objected on relevance grounds, and an off-the-record conference ensued. Following this conference, the parties stipulated before the jury that defendant was returned to custody in 2014 after initially bailing out for a reason other than missing a court date. Later, in closing argument, the prosecutor revisited defendant's testimony about his return to custody, telling the jury, "[W]e know [defendant] deliberately lied about the fact that—the reason he went back into custody was because he missed a court date, because immediately afterwards there was a stipulation that it had nothing to do with that."

Based on this record, considered in its entirety, we reject defendant's first claim of prosecutorial misconduct. Defendant may be correct that it is improper for a prosecutor to elicit testimony relating to a defendant's conditions or circumstances of parole, and that the prosecutor in this case could have impeached his testimony about being returned to custody for missing a court date without mentioning the motion to increase his bail. (*See People v. Smith* (1966) 63 Cal.2d 779, 790, 48 Cal. Rptr. 382, 409 P.2d 222; *People v. Fusaro* (1971) 18 Cal.App.3d 877, 886, 96 Cal. Rptr. 368 ["[prosecutor's] deliberate asking of questions calling for inadmissible and prejudicial answers is misconduct"]; *People v. Harris*, *supra*, 22 Cal.App.4th at p. 1581.) However, the record reflects that defendant was not forthcoming with his responses to the prosecutor's questions regarding his contacts with Silva and the victim. On the contrary, defendant repeatedly claimed Silva was calling him, even as the prosecutor was asking him to confirm he was incarcerated at the time and could not have received calls.

In addition, the victim had testified, contrary to defendant's claim, that she did not attempt to contact him after he was arrested following this incident even though he tried to contact her. Silva testified that defendant reached out to her many times after the incident and, on one occasion, violated the terms of the restraining order that Silva had helped the victim obtain by coming to Silva's house in order to talk to the victim about not filing charges against him. The prosecutor was entitled under these circumstances to explore the nature and extent of the inconsistencies in defendant's testimony. (*People v. Valencia* (2008) 43 Cal.4th 268, 283, 74 Cal. Rptr. 3d 605, 180 P.3d 351 [prosecutor entitled to "ask[] legitimate questions going to the witnesses' credibility"]; *accord*, *People v. Fuiava*, *supra*, 53 Cal.4th at p. 685.) There is no basis to conclude the prosecutor, in doing so, was employing deceptive or reprehensible methods to attempt to sway the jury against defendant, or that her questions so infected the trial with unfairness as to make his conviction a denial of due process. (*People v. Fuiava*, at p. 679; accord, *People v. Dennis* (1998) 17 Cal.4th 468, 522, 71 Cal. Rptr. 2d 680, 950 P.2d 1035.) As a result, the trial court could properly reject defendant's first claim of prosecutorial misconduct as a ground for mistrial.

## B. Reference to Defendant's Offer of a 17-year Sentence

Continuing to defendant's remaining ground for mistrial—the prosecutor's reference to a statement he wrote about being offered 17 years—the record reflects the following. Almost immediately after the jury heard the stipulation regarding defendant's return to custody, the prosecutor began questioning defendant about whether he reached out to the victim through cards or letters instructing her to contact his attorney. Defendant acknowledged doing so, explaining, "She was calling me and asking me, 'What can I do to stop this from going on?' And I said, 'What you can do is you can contact my lawyer. That's the best I can tell you.'" The prosecutor responded with the following: "So in a letter did you write, 'Please call me, sweetheart. If not, I understand'? [¶] [Defendant interrupts.] [¶] 'I love you. They're going to offer 17 years'-"

Defense counsel immediately objected on relevance grounds, and another off-record bench conference occurred. Afterward, the prosecutor continued: "So did you write in a letter, 'Please call me, sweetheart. If not, I understand. I love you. They're going to offer 17 years. I'm not turning my back. But I can't do that much time, paren, 17 years. I love you, and kiss the kids for me. Call my lawyer, Felicia Carrington'?"

Defense counsel again objected, both on relevance grounds and under Evidence Code section 352. The prosecutor argued the evidence was relevant to impeach defendant's testimony that the victim was contacting him when, instead, he was contacting the victim repeatedly and instructing her to call his lawyer. The court accepted the prosecutor's argument, finding "the letter does directly contradict the statements of the defendant and is substantially probative on the issue of credibility and the probative value outweighs the prejudicial effect." The court then permitted the prosecutor to show defendant this letter (the People's exhibit 13) and

to ask follow-up questions regarding why he was asking the victim to call him and whether it was true she was calling him. As cross-examination continued, defendant repeatedly stated that he had loved the victim and expressed frustration with Silva for punishing him for something he claimed not to have done. Eventually, during a break in questioning, defense counsel moved for a mistrial.

As before, defendant argues the prosecutor could have cross-examined him about his letters and purported attempts to dissuade a witness without mentioning the offer of a 17-year sentence. (*See People v. Harris, supra*, 22 Cal.App.4th at p. 1581.) However, in light of defendant's ongoing insistence that the victim was reaching out to him and his refusal to confirm that he was, in fact, contacting her to tell her to contact his attorney, the prosecutor had valid reason to refer him to his statements in the People's exhibit 13. In doing so, there is no basis to infer the prosecutor was acting deceptively or reprehensibly or with the improper motive to inflame the jury against defendant. We conclude the trial court did not abuse its discretion in finding no reversible prosecutorial error or misconduct in this instance and, thus, denying the motion. (*People v. Fuiava, supra*, 53 Cal.4th at p. 679.)

**C. No Prejudice**

In any event, with respect to both alleged instances of prosecutorial misconduct, we see no basis for reversal because, even if we were to assume misconduct occurred, we would conclude defendant suffered no prejudice as a result. Based on the record described above, defendant cannot meet his burden of "'show[ing] a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.'" (*People v. Dykes* (2009) 46 Cal.4th 731, 771-772, 95 Cal. Rptr. 3d 78, 209 P.3d 1.) Nothing in the record suggests it is reasonably probable defendant would have received a more favorable result absent the prosecutor's references to the motion to increase bail or the 17-year offer (*People v. Barnett* (1998) 17 Cal.4th 1044, 1133, 74 Cal. Rptr. 2d 121, 954 P.2d 384 [state law standard]), or that these brief references rendered his trial fundamentally unfair (*People v. Bordelon* (2008) 162 Cal.App.4th 1311, 1323, 77 Cal. Rptr. 3d 14 [federal law standard]). In addition, the trial court eliminated the possibility of prejudice by reading to the jury curative instructions requiring it to disregard the references to a "motion to increase bail" or to "17 years" and to not consider matters of punishment or penalty when deciding whether he committed the charged offenses.

The trial court also permitted the parties to stipulate before the jury that defendant was returned to custody after being released for a reason other than a missed court date after defendant had falsely testified that a missed court date was the reason for his reincarceration. We presume the jurors followed the trial court's curative instructions rather than statements from counsel (*People v. McNally* (2015) 236 Cal.App.4th 1419, 1433, 187 Cal. Rptr. 3d 391), and decline to "'"lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.'" (*People v. Dykes, supra*, 46 Cal.4th at p. 772.)

> Since the prosecutor's conduct did not undermine defendant's chances of receiving a fair trial, we affirm the trial court's refusal to grant him a mistrial. (*People v. Ayala* (2000) 23 Cal.4th 225, 282, 96 Cal. Rptr. 2d 682, 1 P.3d 3 [mistrial should be granted only "when "'a party's chances of receiving a fair trial have been irreparably damaged'"'].)

ECF No. 14-8 at 18-24. Petitioner raised this claim in a petition for review to the California Supreme Court (*id.* at 45) which was summarily denied (*id.* at 89).

### B. Legal Standards

A prosecutor's improper comments will be held to violate a defendant's Constitutional rights only if they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Parker v. Matthews*, 567 U.S. 37, 45 (2012) (per curiam) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)). To grant habeas relief, the Court must find that the state court's rejection of the prosecutorial misconduct claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Parker*, 567 U.S. at 47 (quoting *Harrington*, 562 U.S. at 103).

### C. Analysis

The court cannot conclude that the state court's rejection of petitioner's prosecutorial misconduct claims was error beyond any possibility of fairminded disagreement. As the state court noted, the prosecutor raised the issue of petitioner's bail for the purpose of challenging his testimony that Silva had called him during a period of time he was incarcerated. Additionally, the prosecutor's questioning regarding the seventeen year offer (described in a letter) was relevant in light of petitioner's claim that the victim had, despite her testimony to the contrary, contacted him after the incident. The state court found this questioning proper under state law, and this court may not disturb that finding. *See Estelle*, 502 U.S. at 67-68. Further, there is no clearly established federal law which precludes such rebuttal questioning. *See, e.g., United States v. Mendoza-Prado*, 314 F.3d 1099, 1105 (9th Cir. 2002) ("The government may introduce otherwise inadmissible evidence when the defendant opens the door by introducing potentially misleading testimony.") (internal quotation marks omitted).

Further, "[a] prosecutor's improper questioning is not in and of itself sufficient to warrant reversal. It must also be determined whether the prosecutor's actions seriously affected the fairness, integrity, or public reputation of judicial proceedings, or where failing to reverse a conviction would result in a miscarriage of justice." *United States v. Geston*, 299 F.3d 1130, 1136 (9th Cir. 2002) (internal quotation marks and citations omitted). Such a conclusion cannot be reached here because the trial judge gave the following curative instructions:

> So the Court will also order that you disregard the exchange that took place regarding whether there was a motion to increase bail in court. I don't know if you recall the questions and answers that had to do with that, but the Court is striking the questions and the answers.

and

> There were questions and answers regarding the defendant sending correspondence that talked about 17 years. The Court at this time is directing the jury to disregard that. The Court notes that the jury is not to consider penalty or punishment in making its decision as to whether or not the defendant is guilty or not guilty of the crimes that are before you.

ECF No. 14-6 at 38. And jurors are, absent evidence to the contrary (which petitioner has not provided), assumed to follow their instructions. *Richardson v. Marsh*, 481 U.S. 200, 211 (1987).

III.    Shackling

Finally, petitioner argues that the trial court's decision to shackle him in the jury's presence violated his due process rights.

A.    State Court Decision

The state court of appeal rejected this claim on direct review:

> Defendant contends his federal due process rights under the Sixth and Fourteenth Amendments of the United States Constitution were violated by the trial court's decision to require him to wear full-restraint shackles, visible to jurors, during trial. "Decisions to employ security measures in the courtroom are reviewed on appeal for abuse of discretion." (*People v. Hernandez* (2011) 51 Cal.4th 733, 741, 121 Cal. Rptr. 3d 103, 247 P.3d 167.)

> "Many courtroom security procedures are routine and do not impinge on a defendant's ability to present a defense or enjoy the presumption of innocence. [Citation.] However, some security practices inordinately risk prejudice to a defendant's right to a fair trial and must be justified by a higher showing of need. For example, visible physical restraints like handcuffs or leg irons may erode the presumption of innocence because they suggest to the jury that the

defendant is a dangerous person who must be separated from the rest of the community. [Citations.]  Because physical restraints carry such risks, their use is considered inherently prejudicial and must be justified [under California law] by a particularized showing of manifest need. [Citations.]" (*People v. Hernandez*, *supra*, 51 Cal.4th at pp. 741-742.) "'Similarly, the federal "Constitution forbids the use of visible shackles . . . unless that use is 'justified by an essential state interest'—such as the interest in courtroom security—specific to the defendant on trial." (*Deck v. Missouri* (2005) 544 U.S. 622, 624 [161 L.Ed.2d 953, 125 S.Ct. 2007], italics omitted.)'" (*People v. Covarrubias* (2016) 1 Cal.5th 838, 870, 207 Cal. Rptr. 3d 228, 378 P.3d 615.)

"In deciding whether restraints are justified, the trial court may 'take into account the factors that courts have traditionally relied on in gauging potential security problems and the risk of escape at trial.' (*Deck v. Missouri*, *supra*, 544 U.S. at p. 629.) These factors include evidence establishing that a defendant poses a safety risk, a flight risk, or is likely to disrupt the proceedings or otherwise engage in nonconforming behavior." [Citation.]  Although the court need not hold a formal hearing before imposing restraints, "the record must show the court based its determination on facts, not rumor and innuendo." [Citation.] The imposition of physical restraints without evidence of violence, a threat of violence, or other nonconforming conduct is an abuse of discretion.'[Citation.]" (*People v. Covarrubias*, *supra*, 1 Cal.5th at pp. 870-871.)  Ultimately, we are concerned with whether the record demonstrates the trial court's decision to physically restrain the defendant was based on a thoughtful, case-specific consideration of the need for heightened security, or of the potential prejudice that might result. (*People v. Hernandez*, *supra*, 51 Cal.4th at p. 743.)

Here, the record supporting the trial court's decision to shackle defendant is as follows.  The prosecutor offered evidence of defendant's involvement in the jailhouse altercation on July 12, 2016, during which he brutally attacked another inmate with his fists, bloodying the inmate's face. Based on this report, the charges, and defendant's background, including the trial court's knowledge of prior instances in court where defendant had behaved in an unruly manner ("want[ing] to share his thoughts regarding this case" directly with the court rather than through counsel), the trial court decided security concerns warranted shackling defendant at trial. In doing so, the court acknowledged defendant was "entitled to a jury trial where he is unshackled, or at least the shackles cannot be seen by the jury, because that would prejudice him in the eyes of the jury."

The next day, October 25, 2016, the trial court bailiff, Deputy Sheriff Rogers, testified to personally observing a conversation between defendant and his trial counsel the previous day, during which defendant stated he intended to testify at trial and had a "surprise" for defense counsel. When defense counsel queried him about this surprise, defendant remained vague.  In light of the bailiff's report, the trial court revised its earlier ruling, finding "a manifest need for full restraints" on defendant based on "the statements the defendant made yesterday in the presence of my bailiff about this surprise, my

observations about defendant's tendency to speak out without permission[, and] [¶] [an ex parte letter sent to the court by defendant that] show[ed] [he] was taking action independent of his attorney," as well as the report of jailhouse violence on July 12, 2016.

Thus, defendant appeared shackled and, at the conclusion of trial, the jury was instructed in accordance with CALCRIM No. 204: "The fact that physical restraints have been placed on the defendant is not evidence. Do not speculate about the reason. You must completely disregard this circumstance in deciding the issues in this case. Do not consider it for any reason or even discuss it during deliberations."

According to defendant, the trial court's decision to fully shackle him was an abuse of discretion that requires reversal. We disagree. The record reflects the trial court's consideration of the manifest need, in this particular case, to fully restrain defendant with shackles. Among the individualized facts relied upon by the trial court are the conversation overheard by the bailiff between defendant and his attorney during which defendant warned that he "had a surprise" planned for his attorney, but refused his attorney's request to disclose it; the recent jailhouse altercation during which defendant brutally attacked another inmate with his fists, bloodying the inmate's face; the violent nature of the current charges; and the trial court's concern that defendant was acting independently of his attorney, as reflected by a lengthy letter defendant had written to the court independently of his counsel a few months before.

As stated above, the trial court initially did not deem full restraints to be necessary, but then changed its mind after the bailiff's report of the "surprise." These facts adequately demonstrate that the trial court's decision was not an abuse of discretion. (*People v. Williams* (2015) 61 Cal.4th 1244, 1259, 192 Cal. Rptr. 3d 266, 355 P.3d 444 [manifest need for physically restraining a defendant is established with "'evidence that the defendant has threatened jail deputies, possessed weapons in custody, threatened or assaulted other inmates, and/or engaged in violent outbursts in court'"]; cf. *People v. McDaniel* (2008) 159 Cal.App.4th 736, 745, 71 Cal. Rptr. 3d 845 [abuse of discretion to shackle defendant where "the trial court did not initiate any procedure to determine whether shacking was necessary or make any findings on the record to justify shackling"].) As the California Supreme Court has made clear: "The court need not [wait] until such violence occur[s] before ordering restraints" for the defendant. (*People v. Pride* (1992) 3 Cal.4th 195, 233, 10 Cal. Rptr. 2d 636, 833 P.2d 643.)

Even assuming for the sake of argument the trial court's ruling was erroneous, we would find any such error to be harmless. (*See People v. Hernandez*, supra, 51 Cal.4th at p. 746 [notwithstanding that "the trial court abused its discretion in stationing an officer at the witness stand based on a routine policy, it [wa]s not reasonably probable that defendant would have obtained a more favorable result absent the error"].) Putting aside the wealth of evidence of defendant's guilt that we have already discussed, defendant, given the option to wear civilian clothes at trial, refused, insisting he wanted the jury to know he was incarcerated. Moreover, to lessen any potential prejudice, the

jury was instructed to "completely disregard" the fact defendant was shackled in deciding the issues in this case—an instruction we presume was followed. (*People v. McNally, supra*, 236 Cal.App.4th at p. 1433.) Based on this record, we conclude there is no basis for reversal.

ECF No. 14-8 at 24-27. Petitioner raised this claim in a petition for review to the California Supreme Court (*id.* at 51) which was summarily denied (*id.* at 89).

### B. <u>Legal Standards</u>

In *Deck v. Missouri*, 544 U.S. 622 (2005), the Supreme Court held that "the Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial." *Id.* at 629.

### C. <u>Analysis</u>

The court finds that fairminded jurists could easily conclude that the California court of appeal's decision to deny his shackling claim was consistent with established federal law. *See Harrington v. Richter*, 562 U.S. 86, 103 (2011) ("As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."). As noted by the court of appeal, there was substantial evidence that petitioner was prone to violence – it is undisputed that, as noted *supra*, there was video of him involved in a bloody altercation with another jail inmate. Additionally, the charges were of a violent nature and concern from the trial court bailiff about a "surprise" petitioner might be planning. These factors are more than sufficient to justify a state interest in shackling petitioner. And as the state court observed, defendant insisted on the jury knowing he was incarcerated. Finally, petitioner cannot show actual prejudice resulting from the shackling. *See Hayes v. Ayers*, 632 F.3d 500, 522-23 (9th Cir. 2011) (no habeas relief where petitioner cannot demonstrate "actual prejudice" from courtroom security procedures). The trial court instructed the jury that: "[t]he fact that physical restraints have been placed on defendant is not evidence. Do not speculate about the reason. You must completely disregard this circumstance in deciding the issues in this case. Do not consider it

during your deliberations." ECF No. 14-6 at 163. Again, jurors are presumed to follow their instructions. *Marsh*, 481 U.S. at 211.

IV.    Petitioner's Traverse

In his traverse, petitioner argues that the respondent failed to address his cumulative error argument. ECF No. 17-1 at 22. The court concludes, however, in light of the foregoing analysis, that petitioner's cumulative error argument also fails. *See Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002) ("Because there is no single constitutional error in this case, there is nothing to accumulate to a level of a constitutional violation.").

CONCLUSION

For all the reasons explained above, the state courts' denial of petitioner's claims was not objectively unreasonable within the meaning of 28 U.S.C. § 2254(d). Accordingly, IT IS HEREBY RECOMMENDED that the petition for writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within fourteen days after service of the objections. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991). In his objections petitioner may address whether a certificate of appealability should issue in the event he files an appeal of the judgment in this case. *See* Rule 11, Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

DATED: April 10, 2020.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE